# PARK v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

## Case No. 84-4443

State of Florida, Division of Administrative Hearings

November 15, 1985

### APPEARANCES OF COUNSEL

**William M. Park** for petitioner.

**Jay Adams** for respondent.

### OPINION

J. LAWRENCE JOHNSTON, Hearing Officer.

A final hearing was held in this case in Tampa on August 13 through 16, 1985. The parties requested and received through and including September 18, 1985, in which to file their proposed recommended orders.

The issue in this case is the legality of the action of Respondent,

Department of Health and Rehabilitative Services (Department), in terminating Petitioner, Amelia M. Park (Park), from her employment as legal counsel for the Department's District VI, a Senior Management Service position, effective November 27, 1984.

## FINDINGS OF FACT

1. On July 7, 1978, Petitioner, Amelia M. Park (Park), was hired as District VI Legal Counsel of Respondent, Department of Health and Rehabilitative Services (Department). The position was included in the Florida Career Service System and Park obtained permanent status in the position in January 1979.

The Legislature exempted the position from the Career Service System and made it a Senior Management Service position on November 12, 1981.

2. On the morning of November 9, 1984, Park was in Bradenton to attend a hearing for the Department in Manatee County Court. She had scheduled a meeting with Bill Presmeyer at the Manatee Health Department, but the meeting was cancelled at the last minute. Because Park had pre-approved annual leave for the afternoon, she went to her vacation home located in Holmes Beach on Anna Maria Island. Late in the morning, Park received a telephone call from her secretary, Muriel Pages, who informed Park that Assistant District Legal Counsel, Dennis Palso, who had been on the job only one week, and District Program Manager, Stephanie Watson Judd, wanted to talk to her.

3. Park knew or should have known that the matter to be discussed was considered important by the Department staff or they would not have telephoned her at her home. Judd told Park that the Department had received a court order committing a juvenile to the Department but that they were not sure what the Department properly should do in response to the Order. Palso, who only had been on the job for one week, pointed out internal inconsistencies in the Order. The Order found the juvenile both incompetent to stand trial and not guilty by reason of insanity. The Order also cited the rules of criminal procedure instead of the rules of juvenile procedure. At the request of Carl Neill, the Department's District Administrator, Park's immediate supervisor, Judd and Palso relayed this information to Park and sought her advice on several questions: (1) whether the Order was legal; (2) whether the juvenile could be placed in a mental health facility based on the Order alone without bringing a Baker Act proceeding; and (3) whether and how the Department should take the child into custody.

4. Park responded that the Order was sufficient for the Department

220

to take the juvenile into custody and place him in a mental health facility. Notwithstanding the questions Park was being asked, she assumed that the juvenile was in custody because she would not have expected the judge to release such a juvenile into the community. Park told Palso that he or she would be able to clear up the internal inconsistencies and problems in the Order the following week by filing a motion in court. Park recommended that the Department's staff telephone "central admissions" in Tallahassee since Park believed that office of the Department had experience with similar orders and would know how to proceed.

5. After talking to Park, Judd telephoned Sam Ashdown in Tallahassee to discuss the case and receive advice on how to proceed. In the course of their discussion, Judd read the Order to Ashdown over the telephone and, to her surprise, Ashdown took the position that the Order was illegal and that the Department could not act upon it. Judd informed Ashdown that Park, as District VI's legal counsel, had given the District VI staff a contrary opinion and suggested that Ashdown talk directly with Park, giving him the telephone number at Park's vacation house.

6. Later in the afternoon of November 9, Judd telephoned Park again to inform her about Judd's conversation with Ashdown and to prepare her to receive a telephone call from Ashdown. Park became angry at Judd for having given Ashdown her telephone number. She denied every having given a legal opinion that the Order was legal, but told Judd that there was nothing that could be done about it by the end of Friday afternoon. Park told Judd to call Ashdown back and tell him not to telephone Park about the matter. In the face of Park's tirade, Judd informed Carl Neill of what Park had said and telephoned Ashdown to relay Park's message and tell him not to call Park.

7. Neill became very concerned about the manner in which Park handled the matter earlier in the afternoon of November 9, 1984. Although Park was a knowledgeable lawyer and able advocate for the Department, she had a history of difficulty working, relating, and communicating with certain members of the Department's District VI staff. This history included several occasions in which Park's personal relationships with Department staff deteriorated to the point of affecting Park's ability to work with or even talk to staff. Neill suspected that a recent deterioration in the personal relationship between Judd and Park may have been partially responsible for the manner in which Park handled the juvenile matter on November 9.

8. Park's work relationship with each of the two assistant attorneys

working under her before Palso had deteriorated to the point that Park could communicate with them only in writing and not very well. Park's personality and deficient interpersonal skills was at least partially responsible for those problems in District VI's legal office.

9. Park also had a deserved reputation among District VI's staff for being unpredictable. For no apparent reason, Park would sometimes be unreasonably be irritable and rude. For example:

(a) Park has chastised Joseph Tagliarini in front of other staff for operation (not legal) difficulties in dealing with the local Sheriff's Office. This rebuff was hostile and angry, inappropriate and unwarranted.

(b) On another occasion, Park refused to discuss a personnel matter with Allen Mundy and William Stanley, became rude and directed them to leave her office. Personnel officer, David Stoops, had asked Mundy and Stanley to discuss the matter with Park.

(c) At a training session she was giving on child support enforcement, Park became angered by questions being asked by one of the participants, became progressively more hostile and angry, and ended up yelling at the employee from the podium in the middle of the training session.

(d) James Freyfogel, one of Park's own witnesses, was unfairly accused by Park with having concealed information material to a real estate transaction entered into by the Department. Because of Park's conduct, Freyfogel tried to avoid any contact with her for about a year and a half.

(e) Another of Park's witnesses, Judy Wichterman, testified that Park was "a nasty person" and that she and other counselors avoided contact with Park whenever possible. Park was not even aware of the effect of her personality on Freyfogel and Wichterman.

10. The strained work relationships described in paragraph 9. above (and others) do not typify all of Park's relationships with members of the staff of the Department's District VI. Park had many good days and many positive working relationships. However, Neill was aware that Park's personality had caused several problems in work relationships at District VI and that it was not a matter of one or two isolated incidents. At least park of the blame for these problems rests with Park's personality.

11. Problems caused by Park's personality were not limited to lower staff members whom Park intimidated. For example:

(a) Neill also was aware that Park had unknowingly offended Larry

Overton, then Deputy Assistant Secretary For Operations for the Department in Tallahassee. Overton related to Neill that Park had become hysterical during a meeting he had with her concerning problems with a nursing home in District VI.

(b) In the fall of 1984, Park insisted on beginning a letter to a private attorney with whom she was dealing on behalf of the Department by stating that she was "outraged" at some of the attorney's tactics and conduct. Neill had specifically requested that Park, as representative of a State agency, not express "outrage." Neill told Park that he thought this form of expression was inappropriate, and he directed that the letter be reworded. Despite Neill's direct request, Park sent the letter as originally written with the justification that she was indeed "outraged."

(c) Park also angered two judges before whom she appeared as attorney for the Department, a Judge Pope and a Judge Calhoun. In compliance with Neill's suggestion and remark, Park wrote a letter of apology to Judge Pope.

12. When Park returned to work after the weekend and Monday holiday on Tuesday, November 13, 1984, Neill asked her into his office to discuss the events of November 9. During the discussion Neill referred to the events of November 9 as an emergency, and Park attempted without success to learn from Neill why it was an emergency. Neill explained his position that it is unacceptable for senior managers on leave to refuse to permit HRS staff to contact them to discuss matters staff believes needs to be discussed. Neill stated that senior managers must be available in such circumstances. Park became very angry and upset at having been accused of less than satisfactory performance. She lost her temper in front of Neill. She stated that she was incensed that Judd had given her home telephone number to Ashdown and stated that, in the future, she would avoid this situation by not leaving a telephone number where she could be reached. Park then stormed out of Neill's office.

13. As a result of all of the events referred to in these Findings of Fact, including Neill's meeting with Park on November 13, 1984, Neill's confidence and trust in Park was shaken. Neill did not believe he could continue to function with Park as his legal counsel. Neill did not think he could count on Park to make herself available to Neill and his staff when needed. Neill also believed he could retain competent legal counsel who would be able to get along better with a larger park of Neill's staff so that Neill's staff could function more smoothly and effectively as a whole. Neill telephoned HRS supervisors in

**223**

Tallahassee for advice and was told that he had authority to terminate Park in his discretion.

14. After spending the rest of the day and evening of November 13 making up his mind, Neill decided to terminate Park as his legal counsel. On November 14, 1984, Neill again met with Park and informed her that he intended to make a change in the position of legal counsel and asked for Park's assistance in making the transition smooth. Park interpreted Neill's comments as a request for Park's resignation, and Park responded that she could not agree to resign without giving the matter further thought and discussing it with her husband, Park's counsel in this case. Because of Park's work scheduled, she requested until Monday, November 19,1984, to give Neill an answer, and Neill agreed.

15. On November 19, 1984, Park and her husband met with Neill as scheduled at 8:30 in the morning. Neill handed Mr. Park a letter informing Park of Neill's intent to terminate Park's employment effective November 27, 1984. Mr. Park asked if the meeting was a pre-termination conference. Neill stated that he did not believe a pre-termination conference was required for senior management but that he was willing to treat the meeting as a pre-termination conference and would consider anything Mr. or Mrs. Park had to say about the matter. Mr. Park suggested to Neill that Neill was exposing himself to possible personal liability by terminating Mrs. Park but had nothing else to say about the matter. The Parks stated that they had all they needed and left Neill's office.

16. Towards the end of the final hearing, Park stipulated that she was not dismissed for political reasons.

## CONCLUSIONS OF LAW

1. The Senior Management Service is a separate system of personnel administration for positions in the executive branch, duties and responsibilities of which are primarily and essentially policy-making or managerial in nature. Section 110.402(1), Florida Statutes (1983). The Senior Management Service is limited to positions which are exempt from the Career Service Syste by Section 110.205(2), Florida Statutes (1983). Section 110.402(2), Florida Statutes (1983).

2. Employees in the Career Service System who have permanent status may only be suspended or dismissed for cause. Section 110.227(1), Florida Statutes (1983). Those employees have a right to a hearing before the Career Service System on the issue whether there was cause for a suspension or dismissal. Section 110.309, Florida Statutes (1983). Upon a finding that just cause did not exist for the

224

suspension or dismissal, the Career Service Commission may order the reinstatement of an employee, with or without back pay. *Id.* Subsection (3). In addition, the Career Service Commission may order the agency to pay the employee's reasonable attorney's fees, witness fees and other out-of-pocket expenses incurred during the prosecution of an appeal against an agency in which the Commission sustains the employee. *Id.,* Subsection (5). Before creation of the Senior Management Service, state employees who were exempted from the Career Service System had no right to a Section 120.57, Florida Statutes (Supp. 1984), proceeding on matters covered by the Career Service System. See *Nute vs. Florida Department of Law Enforcement,* 397 So.2d 1222 (Fla. 1st DCA 1981).

3. In *Hasper v. Department of Administration,* 459 So.2d 398 (Fla. 1st DCA 1984), and *Hasper v. Department of Labor and Employment Security,* 459 So.2d 400 (Fla. 1st DCA 1984), it was held that state employees in Senior Management Service positions have a substantial interest in their positions so as to entitle them, upon termination, to a "fair and impartial hearing conducted by a Hearing Officer provided by the Division of Administrative Hearings of the Department of Administration, pursuant to Section 120.57(1)." *Hasper v. Department of Labor and Employment Security,* 459 So.2d at 402. This right was said to arise from Section 110.403(1), Florida Statutes (Supp. 1984), which provides in pertinent part:

> In order to implement the purposes of ss. 110.401-110.405, the Department of Administration, after approval by the Administration Commission, shall adopt and amend rules providing for: . . . . (c) a system which shall provide for an effective method of removing from the service those managers whose performance is inadequate while, at the same time, providing protection from political abuse of employment power.

According to the *Hasper* decisions:

> Thus, under the statutory framework, an employee within the Senior Management Service may be removed for inadequate performance or performance which is not reflective of a highly competent senior-level manager, and may not be removed for political reasons. . . . When read in conjunction with the statute which provides its authority, the challenged Rule is susceptible of the construction that an employing agency is authorized to terminate a Senior Management appointee only for reasons of inadequacy of performance or other reasons which do not constitute a political abuse of employment power.

*Hasper v. Department of Administration*, 459 So.2d at 400.

4. In apparent response to the *Hasper* decision, the 1985 Florida Legislature enacted Chapter 85-318, Laws of Florida (1985). Section 4 of Chapter 85-318 deletes the language of Section 110.403(1)(c), Florida Statutes (Supp. 1984), upon which the *Hasper* decisions were based. In addition, it adds to Section 110.403(1)(a), Florida Statutes (Supp. 1984), the following pertinent language:

> Employees in the Senior Management Service shall service at the pleasure of the agency head, and shall be subject to suspension, dismissal, reduction in pay, demotion, transfer, or other personnel action at the discretion of the agency head. Such personnel actions are exempt from the provision of Chapter 120.

Section 4 of Chapter 85-318 took effect on July 1, 1985. Section 15, Chapter 85-318, Laws of Florida (1985). It is therefore now clear that employees dismissed from Senior Management Service positions on and after July 1, 1985, have no right to a hearing under Section 120.57, Florida Statutes (Supp. 1984).

5. The enactment of Chapter 85-318 reflects the Legislature's intent that employees in Senior Management Service positions should be subject to dismissal at any time and for any reason. Compare *Hasper v. Department of Administration*, 459 So. 2d at 400. For this reason, the rights and remedies engrafted on Section 110.403(1), by the *Hasper* decisions should not be expanded beyond those explicit in those decisions.

6. After the evidence introduced at final hearing made it clear, Park ultimately conceded that she was not dismissed for political reasons. Under the properly strict construction of the rights and remedies afforded under the *Hasper* decisions, that concession alone resolves her petition against her.

7. In addition, there was ample evidence to prove that Park was terminated "for inadequate performance or performance which is not reflective of a highly competent senior-level manager" or, in other words, "only for reasons of inadequacy of performance or other reasons which do not constitute a political abuse of employment power." *Hasper v. Department of Administration*, 459 So.2d at 400. This does not necessarily mean that HRS had "cause" for Park's dismissal, as would be required for dismissal of a Career Service employee, or that the decision of HRS' management to dismiss Park was the best decision it could have made. It does not mean that Park is incompetent, unskilled or unknowledgeable. It means only that the

226

reasons for Park's dismissal were related to inadequacies in her performance.

(a) First, Rule 22SM-1.09, Florida Administrative Code, required Park to "work whatever hours may be required by the position." In handling the issues that arose on November 9, 1984, Park refused to allow HRS staff to telephone her at home on issues they and Neill thought were important. Later, in a confrontation with Neill on November 13, 1984, Park threatened not to let him know her whereabouts in the future.

(b) Second, the evidence was persuasive that the confidence of Park's primary "client" at HRS, Mr. Neill, in Park was eroded by Park's job performance. The impact the events of November 9 and 13 had on Neill were enough to justify his decision to dismiss Park from her Senior Management Service position.

(c) Finally, the evidence also proved that Park had a history of difficulty relating to and working with a number of people on HRS' staff. These shortcomings were job-related shortcomings on the basis of which HRS had discretion to dismiss Park from her Senior Management Service position.

## RECOMMENDATIONS

Based upon the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that Respondent, Department of Health and Rehabilitative Services, enter a Final Order consistent with the previous exercise of its discretion to terminate Petitioner, Amelia M. Park, from her Senior Management Service position.

RECOMMENDED this 15th day of November, 1985, in Tallahassee, Florida.